### AULTMAN & TAYLOR COMPANY v. RUSH.

1. Findings of fact by the master concurred in by the Circuit Judge, sustained.

2. The respondent held bound in this court by findings of fact in the court below, to which he filed no exceptions, notwithstanding the judgment below was wholly in his favor.

3. A married woman had no power at common law to bind herself or her estate by contract; her contractual powers are derived wholly from the constitution of 1868 and the statutes passed in pursuance thereof.

4. The provision of the constitution in relation to the rights of married women had but three purposes: 1. To make the property of the wife her separate estate. 2. To protect this property from levy and sale for her husband's debts. 3. To confer upon the wife the power to bequeath, devise, and alienate it. The constitution does not empower a married woman to mortgage her separate estate.

5. The main intent of this constitutional provision was to exempt and protect the property of the wife from the debts of the husband.

6. The provision in section 2036 of General Statutes, that "all deeds, mortgages, and legal instruments of whatever kind shall be executed by her [a married woman] in the same manner, and have the same legal force and effect, as if she were unmarried," does not *confer* the power of executing legal instruments, but only declares the mode by which she shall execute such papers as the law elsewhere empowers her to make, and their effect when so executed.

7. Under the law (*Gen. Stat.*, § 2037), a married woman can contract and be contracted with only as to her separate estate. A note signed by her merely as a surety for her husband, is not binding on her, and not being binding, a mortgage of her property given by her to secure such note is beyond the powers conferred upon a married woman.

8. In the sense of this act, a mortgage is not a contract; but even if it were, the mortgage here was not a contract as to the wife's separate estate. *Cases reviewed.*

9. Petition for rehearing refused.
    MR. JUSTICE McGOWAN *dissenting*.

Before HUDSON, J., Abbeville, October, 1886.

This was an action of foreclosure instituted by the Aultman & Taylor Company against J. N. Rush and Eugenia J. Rush, his wife. The mortgage was given by the wife to secure two joint and several promissory notes, given by both defendants, for the purchase money of a steam engine, with a clause added requiring the payment of counsel fees in case of suit. The steam engine had been previously ordered in writing, as follows:

NEW MARKET, June 4, 1884.
*To the Aultman & Taylor Company, Mansfield, Ohio:*

You will please ship to the undersigned, J. N. Rush and Eugenia J. Rush, one ten-horse traction engine (second hand).

This certifies that the undersigned agrees to receive the above described machinery on arrival and agree to pay to your order at the time and place of delivery above named eight hundred dollars.

Note due 1 January, 1885, for $400.00.

Note due 1 January, 1886, for $400.00.
(Signed)     J. N. RUSH,
    EUGENIA J. RUSH.

Desiring to obtain goods and credit as indicated in the written order, I hereby certify I am a married woman and own in fee simple, in my own name, 318 acres of land in Abbeville County, over and above what is exempted by law for homestead or other purposes, the value whereof is $1,200.
(Signed)     EUGENIA J. RUSH.

Mrs. Rush put in a separate defence, claiming that she was not bound because she was a married woman, and the notes and mortgage did not concern her separate estate. The master, to whom the issues were referred, held *inter alia* that as only she owned land, and as the engine was to run a saw mill to saw timber on that land, and a thresher to be used, in part, on crops of grain made thereon, the purchase did concern her separate estate. The

case was heard in the Circuit Court on exceptions to this report, and the following decree was filed:

This action is founded upon two notes given by J. N. Rush and his wife to the plaintiffs for the purchase money of a steam engine sold and delivered by the plaintiffs to the defendant, J. N. Rush. . These notes are secured by a mortgage upon the real estate of Mrs. Rush, the wife, duly executed by her, and also by the husband, who joins her in the deed of mortgage. Two defences are set up, to wit: First, a breach of contract in failing also to sell and deliver a saw mill, followed by a counter-claim for damages resulting therefrom; and secondly, the non-liability of Mrs. Rush upon the notes and mortgage, because she was, at the time, and still is, the wife of J., N. Rush. The land conveyed in the mortgage is her separate property. The master has found that there was no breach of contract affecting the sale of the engine, and consequently rejects the counter-claim for damages. In this I concur, as the evidence fails to establish this defence.

Upon the special defence of the wife, the master finds that she is by the terms of the statute bound by her mortgage of her separate estate; and that she is also bound because the whole contract was for the benefit of her separate estate. Upon the latter branch of this proposition I do not concur with him, and hold that if nothing but the notes had been given, under the evidence she would not be chargeable. Upon giving the mortgage, however, her liability did become fixed, at least to the extent of the value of the land embraced therein, should it be less than the debt; and should it be more than the debt, then to the extent of the debt only, of course. Under our Constitution, section 8 of article XIV., and under section 2036 of the General Statutes, the power of a married woman to acquire property is limited only by her means to do so, and her power to dispose of it is limited only by her will and pleasure, and all contracts in reference thereto, voluntarily entered into by her, are binding upon her, just as if she were unmarried. She can mortgage it, or transfer it in any way at her pleasure, and for any purpose of a lawful nature.

With these modifications the master's report is confirmed and

the exceptions thereto overruled. Let the plaintiffs have judgment of foreclosure and sale of the premises in accordance herewith, and let the same be prepared by counsel in due form for the amount found due by the master, including such a fee to counsel as the master shall report upon testimony taken, for which purpose he is directed to hear testimony and report at once to this court.

The defendants appealed upon several exceptions which raised the precise points considered by this court.

*Messrs. Graydon & Graydon,* for appellants.

*Messrs. Perrin & Cothran* and *Sheppard Bros.,* contra.

April 20, 1887. The opinion of the court was delivered by

MR. CHIEF JUSTICE SIMPSON. The facts of this case, as stated in the decree of his honor, Judge Hudson, who heard it, are substantially as follows: The action was founded upon two notes, given by J. N. Rush and his wife, Eugenia, for the purchase money of a steam engine. The notes were secured by a mortgage upon a tract of land, the separate estate of the wife, which mortgage was executed by the wife, her husband joining therein. The object of the action was to foreclose the mortgage. Two defences were set up. First, a breach of contract, and a counter-claim for damages, growing out of said alleged breach. Second, the non-liability of Mrs. Rush on the notes and mortgages, she being a married woman.

The master, to whom the case was referred, reported that there was no breach of the contract, in which his honor concurred. He also reported that Mrs. Rush was liable both by the terms of the statute and because the contract was for the benefit of her separate estate. His honor did not concur in the latter branch of this proposition, to wit, that the contract was for the benefit of her separate estate, but he sustained the master in the first branch, holding and decreeing that the liability of the wife was fixed by the mortgage, at least to the extent of the value of the land embraced therein, should so much be necessary to pay the debt, and he ordered a foreclosure, &c. He also allowed a fee of $50 to plaintiffs' attorney, to be paid out of the proceeds of the sale.

The appeal of the defendants alleges error, in that his honor sustained the findings of the master that there was no breach of the contract, nor damages resulting therefrom, supporting their counter-claim. Second, because his honor held Mrs. Rush liable, under her mortgage, to the extent of the value of the land, if so much was necessary. And third, that he allowed a fee of $50 out of the proceeds of the land to plaintiffs' attorney.

The first question is a question of fact, in which the master and the judge concurred. We have examined the evidence, and we do not find such a want of support to this finding as would warrant us to reverse it. We must therefore regard the fact thus found as established. And we sustain the law applied to said finding. This disposes of the counter-claim, &c.

The main question in the case is as to the liability of Mrs. Rush on her mortgage, or rather the liability of her separate estate for a debt contracted by her husband, to which she, however, was a party, and to secure which she executed the mortgage in question, although said debt was not contracted for the benefit of said separate estate. This brings up squarely the question whether a married woman can mortgage her separate estate for a debt not contracted for its benefit, the debt in fact being the debt of another party, in this instance that of her husband. Or whether, being herself limited to contracts "as to her separate estate," she is not also confined in the execution of mortgages to that limit, to wit, to contracts "as to her separate estate."

The Circuit Judge held that the notes sued on were nullities as to Mrs. Rush, the fact having been established that they were not given for the benefit of her estate. This holding was no doubt correct, under the principle of the recent case of *Habenicht* v. *Rawls*, 24 *S. C.*, 461. We must start out, then, with the proposition that Mrs. Rush is not liable in any way upon the notes sued on; that they were void as to her, for the reason that she had no power to make them, she being at the time a married woman, and the notes, not being the evidence of a debt contracted "as to her separate estate." So the clear question is, as stated, whether a married woman can mortgage her separate estate to secure such notes.

It will be conceded, without argument, that a married woman

has no such power at common law. It follows, then, that if she has such power, it must be found conferred upon her by one or both of the two other sources of all of our law, except the common law, to wit, the constitution of 1868 and the statutes enacted in accordance therewith. The boundary, therefore, of the question is the constitution and the act of the assembly upon the rights of married women, to which we will now address ourselves.

There is but one section in the constitution on this subject, which is as follows: "The real and personal property of a married woman, held at the time of her marriage, or that which she may thereafter acquire, either by gift, grant, inheritance, devise, or otherwise, shall not be subject to levy and sale for her husband's debts, but shall be held as her separate property, and may be bequeathed, devised, or alienated by her the same as if she were unmarried." Article 14, section 8.

In considering the question it must be borne in mind all the time, and it may be well to repeat it here, that before the adoption of the constitution of 1868, and the acts passed since on this subject, a married woman in this State was absolutely devoid of all power in the premises, except in trust estates where certain power might be conferred. But generally she was powerless as to all contracts, mortgages, conveyances, deeds, and all such papers. Such being the fact, it follows that she is still powerless, except so far as her rights in this regard have been enlarged by the constitution or the acts, which enlargement must be pointed out, and to which she must be confined.

Now, the general right to make a mortgage of her separate estate to secure even her own debt, much less the debt of her husband or of any other person, certainly cannot be claimed under the section of the constitution referred to above. That section has but three purposes (neither of which embraces the power in question), to wit, first, to declare the property of the wife, however acquired, to be her separate estate; second, to protect this property from levy and sale for her husband's debts; and third, to confer upon the wife the power to bequeath, devise, or alienate said property. It is true that by it her common law disability has been removed to some extent, to wit, to the extent of allowing her to bequeath, devise, and to alienate *her separate estate,*

and this she is authorized to do as fully as if she were a single woman, but nothing more. Her disability as to all else remains as before, so far as the constitutional provisions affect her, the prime and essential object of which seems to have been to protect the property of wife from debts and contracts of the husband, and to obviate the necessity of a trustee to this end.

This was, no doubt, the motive and foundation of the section, and this was accomplished in its first branch, and then follows the power to bequeath, devise, and alienate, which was a necessary incident to the enjoyment of the legal ownership of the property with which the wife had now been invested. Giving a lien, however, on real estate by a mortgage is neither a bequest, a devise, nor an alienation ( *Warren* v. *Raymond*, 17 *S. C.*, 198), and yet this is all the power conferred by the constitution. And, besides, if such lien is intended to secure the payment of a debt of the husband, it would defeat the main and most important purpose of the section, to wit, the exemption of her property from his debts.

We conclude, therefore, that the mortgage of Mrs. Rush finds no support in article XIV., section 8, of the Constitution.

Let us next examine the act of assembly on this subject, to wit, sections 2035, 2036, and 2037 of the General Statutes. Section 2035, and the first part of section 2036, contain nothing more than the provisions, nearly *verbatim*, of the constitution, *supra*, and therefore they need no further consideration here. The latter part of section 2036 provides for the disposition of the estates of married women dying intestate, which is not involved here; then follows a provision, "That all deeds, mortgages, and legal instruments of whatever kind shall be executed by her in the same manner, and have the same legal force and effect, as if she were unmarried." This provision is earnestly claimed as furnishing the right to mortgage, it being contended that the power to do so is here conferred. This proposition will be considered below. Section 2037 provides: "That a married woman shall have the right to purchase any species of property in her own name, and to take proper legal conveyances therefor, and to contract and be contracted with, as to her separate property, in the same manner as if she were unmarried."

These sections of the general statutes were taken from the act of 1870 (14 *Stat.*, 325), entitled, "An act to carry into effect the provisions of the constitution in relation to the rights of married women," being sections 1, 2, and 3 of that act. To ascertain their true intent and meaning, they must be construed together and as a whole. At the time of the passage of this act, 1870, the words, "as to her separate estate," immediately following the words, "to be contracted with," in section 2037, were not incorporated. They have since (1882) been inserted by amendment, but before the execution of the mortgage herein. Without these words, supposing the general assembly could invest a married woman with power beyond that conferred by the constitution (see *Pelzer, Rodgers & Co.* v. *Campbell & Co.*, 15 *S. C.*, 590), there is no doubt that section 3 of the act of 1870 invested her with all the powers of a *femme sole*, completely annulling all the disabilities of marriage at common law, and making her absolutely free and competent to make any contract or to execute any kind of a paper, deed, or mortgage that a *femme sole* could make.

And section 2, now section 2036, General Statutes, recognizing her right in this respect as then conferred in section 3, now 2037, General Statutes (with those important words omitted), provided in its last clause, as stated above, to wit, that all deeds, mortgages, and legal papers that she might execute should be executed in the same manner, and should have the same legal force and effect as if she were unmarried. We do not conceive, however, that this recognition was the conferring of an independent power to execute a mortgage or other paper, in addition to the power conferred in section 3 of the act; but we think it was a mere declaration that such papers, deeds, mortgages, as she could legally make under the general provisions of the act, should be made as other people made them; that is, in the same manner as to form, &c., and when so made they should have the same force and effect as other deeds, &c. And therefore instead of looking to this section to ascertain what papers she can make, we must look to the constitution and to section 2037, where her powers are expressly conferred. In other words, section 2037 of the General Statutes and section 8 of the Constitution are the sections which confer the powers, and sec-

tion 2036 declares the manner in which said powers shall be exercised, at least as to the execution of the papers therein mentioned.

Now, as the act of 1870, in section 3, conferred, as it did, upon married women full power to contract and be contracted with, on any and on all matters, no doubt this power carried with it the power to secure the performance of her contracts by a mortgage of her property. Hence the necessity of section 2 prescribing the manner of execution. And if this case had arisen before the amendment mentioned, when the powers of the wife were unlimited, doubtless the judgment below would be held correct. But it has occurred since, and the act, as it now reads, must be applied to it; and in making the application we are not to know that said words were at any time absent or omitted.

As the section now reads, it must be admitted that no power to contract or be contracted with except "as to her separate estate" is conferred upon a married woman. That is the language of the section, and there is no ambiguity about it, and there being no additional power conferred elsewhere, the exercise of any other must be illegal. Now, it is admitted, or at least the judge has found as a matter of fact, and there is no exception to said finding[1] that the notes sued on here were not contracts "as to the separate estate" of Mrs. Rush, so that the conclusion is inevitable, and the Circuit Judge has so held, that they must be expunged from the case. This leaves nothing but the mortgage as to her. Can it be construed and held a contract "as to her separate estate"? If not, can it be enforced in face of the fact that she can make no other kind of contract?

First, is a mortgage a contract in the sense of the act? A contract is an agreement founded upon a legal consideration, to

[1] The judgment in this case was wholly in favor of the plaintiff corporation, and therefore an appeal by the plaintiff would have been improper practice. If the result be correct, the judgment will not be disturbed even though such result was reached by an erroneous course of reasoning. See *Dearman* v. *Trimmier*, next case *ante*, and many other cases. But the principal case, and others, show that it is necessary for the successful party to take exceptions to all the findings of fact with which he is not satisfied, if he desires in this court to question their correctness. These exceptions and a notice to the appellant that the respondent will rely upon the grounds thereby raised, in support of the judgment below, should be printed in the Brief.—REPORTER.

do, or not to do, &c.   A mortgage is the imposition of a lien on certain property therein mentioned, given to secure a contract; but it is something independent of the contract itself, and is collateral thereto.   It is a means consented to, by which the contract to which it is collateral may be enforced.   Doubtless, as we have said, the power to make a contract carries with it the power to execute a mortgage to secure it, but where there is no power to make the contract to be secured, whence cometh the power to secure it by a mortgage?   If it exists at all, it must be found elsewhere than in section 2037, because, as we have seen, that confines the wife entirely to contracts "as to her separate estate."

It is contended that it is found in the last clause of 2036, quoted above, so that the question comes back again, does this clause confer such power?   We have already given our understanding of the intent of this clause, to wit, that it was nothing more than to prescribe the manner of the execution of the papers, which a wife could make under the other provisions of the act, &c.   To support this view we may say it can hardly be supposed that the general assembly intended to confer power on a married woman to make a mortgage of her estate to secure a contract, which contract it had declined to permit her to make.   This is the exact case claimed here.   It is conceded that the notes given by Mrs. Rush are nullities as to her, on the ground that not having been made "as to her separate estate," she was without power to give them.   They are, therefore, confessedly utterly void as to her, and yet it is claimed that she has made her estate liable to pay them by her mortgage.

There may be, in some respects, a difference between one being liable personally on a contract, and certain of his property being made liable thereby—the difference between a contract *in personam* and a contract *in rem*.   But that difference cannot be interposed here to support the judgment below.   The scheme of the married woman act was chiefly—we may say, almost entirely—to protect her property, and to consecrate it to her use, especially against the debts of her husband.   We cannot, therefore, suppose that it was intended to limit her power to contract personally as to her separate estate, and then give her the power to mortgage

unlimitedly said estate, not only for her own debt, but for the debt of any one else, and whether contracted "as to her separate estate" or not; yet such would be the result of the position contended for. It seems to us that before we could reach such a conclusion bearing such fruit, we should find some language expressly conferring this remarkable, inconsistent power, instead of relying on a mere inference drawn from general terms like those in section 2036.

If this be the true doctrine, we would have the strange inconsistency of a married woman having no power to make any contract herself, except "as to her separate estate" (section 2037), and yet having the power to pledge her whole estate by mortgage to secure the contract of another, made without reference to said estate—thus sowing the seeds of inevitable destruction in the very scheme which the married woman's act was intended to establish—the protection of her property, and its dedication, as it were, to her use, free from the debts and contracts of her husband. Let the doctrine contended for be the law, and the scheme of the act is gone; because it is well known how willingly a confiding wife will execute any paper desired by her husband, especially if there be hope to save him from wreck or financial ruin.

But admit that a mortgage is a contract in the sense of the act, was it a contract here "as to the separate estate" of Mrs. Rush? True, it embraces her separate estate, but did it have reference thereto in the sense of the act? The only reference it had was to encumber it with a lien for the contract of another. Is such a reference included in the meaning of the words "as to her separate estate"? Was it intended by restricting a married woman to contracts "as to her separate estate" to include every and all contracts that might in any way affect or bear upon said estate? If so, she had this power in full before these words were inserted in 1882, as we have seen above. As the section stood originally she had all the powers of a *femme sole*. She could make a contract of any kind, and her separate property was liable, like the property of any other debtor, to be reached by action and judgment, and she could mortgage it, as she pleased. Why, then, insert the suggested words? It must have been because the legislature saw the danger to her, in this broad power, and with the

view to shield her from it, and doubtless to prevent her from doing the very thing attempted here, she was confined by the amendment to contracts intended to benefit her estate, or at least having some direct reference to it, independent of any other contract to which it might be attempted to be pledged as a collateral.

Now, the mortgage here is not a contract of this kind; it was not intended in itself to secure any benefit or improvement to the separate estate, or to affect it in any way in the sense of the act. Nor was it intended to secure a contract made for that purpose. On the contrary, it was intended to secure the purchase money of a steam engine, bought by her husband, and, according to the facts found, having no reference whatever to the separate estate of Mrs. Rush.

It is not our province to suggest what the law should be, either in this or in any other matter, and this we have not attempted here.  Our duty is to declare what the law is in the case before us, and to this we have confined ourselves, reaching the conclusion in so far as it depends upon the construction of the constitution and the act of 1870, that the judgment below must be reversed.

There is now nothing left but to show that our decided cases are not in conflict with the conclusion reached, which, we think, will appear from a short reference thereto.  The cases in our reports touching this subject are *Witsell* v. *Charleston,* 7 *S. C.,* 88; *Ross* v. *Linder,* 12 *Id.,* 592; *Pelzer, Rodgers & Co.* v. *Campbell & Co.,* 15 *Id.,* 587; *Witte* v. *Wolfe,* 16 *Id.,* 256; *Clinkscales* v. *Hall,* 15 *Id.,* 604; and the late case of *Habenicht* v. *Rawls,* 24 *Id.,* 461.

In *Witsell* v. *Charleston,* the contest was over certain city stock, personal property, and the main question involved was, whether a married woman, Mrs. Witsell, had power to alienate her stock, under article XIV., section 8, of the Constitution, in which she had an equitable estate at the time of the adoption of the constitution.  The court held, under the facts of that case and the character of the trust, that she could, and incidentally having the power to alienate, she could pledge it for her husband's debts.

In *Ross* v. *Linder* nothing was decided, except that a wife could bind herself by contract.

In *Pelzer, Rodgers & Co.* v. *Campbell & Co.,* a married wo-

man signed the notes of her son as surety. The court held that she could do so under the act of 1870, and further, that there was nothing in the constitution of 1868 which prevents the legislature from giving a married woman rights and powers in addition to those conferred by that instrument, as was done in the act of 1870, to the extent of making her a *femme sole* as to contracts generally, &c., the constitution having given her no other power but to bequeath, devise, and alienate her separate estate.

In *Clinkscales* v. *Hall*, it was held that a married woman might be sued at law upon a personal contract entered into as surety for her husband.

In *Witte* v. *Wolfe*, the court held that a married woman may contract as surety for her husband, and thereby make herself and her separate estate liable for the payment of the debts, and also, that under the act of 1870 she could mortgage a tract of land conveyed to her after the passage of that act, and that, independently of the constitution and the act of 1870, she could mortgage a tract of which she was a *cestui que trust*, the trust deed giving her such power.

All of these cases, however, were decided before the amendment of 1882 to the act of 1870, by which the important words, "As to her separate estate," were inserted, and when there was no doubt, these words being absent, that a married woman by the force and effect of the act had all the powers of a *femme sole* as to making contracts. Of course, then, she could become surety for her husband or for any one else, or she could execute a mortgage or any other paper that a *femme sole* could execute.

We come next to *Habenicht* v. *Rawls*. This is a recent decision, and since the amendment of 1882. It was a case in which Mrs. Agnew, a married woman, endorsed certain notes made by Rawls and Wilhalf, in discharge of a lien which the payee of said notes held on a stock of goods of Rawls and Wilhalf. The question in the case was, could she be made liable on her endorsement? This court held that while before the amendment of 1882 to the act of 1870, and in accordance with the cases mentioned above, had the endorsement been made then, she would have been responsible; yet that now, and since the amendment, she could not be held liable, as that amendment limited her power exclu-

34

sively to contracts, the object of which was to affect directly her separate estate, as contradistinguished from a contract with an intention merely to bind said separate estate—Mr. Justice McIver closing a most carefully considered opinion for the court in these words : "If, therefore, a wife should sign a note as surety for her husband, or, indeed, for any other person, and should declare in the note, in express terms, her intention to bind her separate estate, that would not make the contract valid as to her, unless it was made to appear that the contract, though executed by her as surety, was designed to benefit her separate property, or in some way related to or concerned such property." This case, we think, is conclusive of the question.

We have not referred to cases decided in other States, for the reason that the question involved is mainly statutory. And as the statutes of the different States differ materially in their provisions, the cases construing them elsewhere could give us no aid here.

It is the judgment of this court, that the judgment of the Circuit Court be reversed, and that the case be remanded, with leave to the plaintiff to apply below for judgment against the defendant, J. N. Rush, for the amount due on the note.

MR. JUSTICE McIVER concurred.

MR. JUSTICE McGOWAN, *dissenting*. I cannot concur in this judgment. I am so much dissatisfied with it that I had intended to express my views upon the subject at some length, but I find myself under such circumstances as not to be able to do it at this time. Considering, however, its great importance, I cannot consent to let it pass without indicating at least the heads of my objections.

It seems to me that the opinion proceeds upon the mistaken view of going back to the common law as the basis of construction, instead of to the constitution of 1868, which, as I conceive, was intended to supersede the old common law doctrine as to the rights of married women, which, as to property, substantially merged the existence of the wife into that of her husband, and to substitute therefor a fundamental constitutional provision, giving to married women civil existence not only as to the power of

acquiring and holding property in her own right, but also as to the corresponding power to dispose of it.   The power to hold the fee, as a rule, carries with it the inherent right of the *jus disponendi;* and when it was considered wise to make a great change as to the power of acquiring, it was not unnatural that there should come with it a corresponding change as to the power of disposal— one being the logical sequence of the other; otherwise, the power to receive and hold, without the power of disposal, would have in it something of that element which made the mortmain laws so objectionable.

The provision of the constitution is as follows: "The real and personal property of a woman, held at the time of her marriage, or that which she may thereafter acquire, either by gift, grant, inheritance, devise, or otherwise, shall not be subject to levy and sale for her husband's debts, but shall be held as her separate property, and may be bequeathed, devised, or alienated by her, the same as if she were unmarried," &c.   I would ask if there is any one whose mind is unbiassed by long familiarity with the common law doctrine, who can read this provision as a whole without being perfectly satisfied that the purpose was threefold: first, to supersede the common law by endowing a married woman with the power to acquire and hold property in her own right; second, to protect that property from, not her own, but her husband's debts; and third, to give her the general power of disposal thereof, "the same as if she were unmarried"—the words, "bequeath or devise," enabling her to dispose of her property at her death, and the word "alienate" to dispose of it during her life?

Is it not plain that the grant of the power to acquire and "alienate" property, gave at the same time the power to *contract,* so far, at least, as was necessary to the act of acquiring or of alienating?   It is not allowable to assume that a constitutional provision would give a power without giving also the means necessary to execute it.   As it seems to me, the power to purchase and alienate necessarily carries the power to make a contract in respect to the property.   In my judgment, the power of a married woman to contract in respect to her separate estate was not given to her by any act of the legislature, but by the constitution itself, which gave her the express powers to acquire, hold in her own name,

and to "alienate" it, and all powers necessary in executing those expressly given.

This was certainly the contemporaneous construction. In 1870 the legislature passed the "Act to carry into effect the provisions of the constitution in relation to the rights of married women," which, after repeating the very words of the constitution, then, in order to make the matter more clear and full, proceeded as follows: "A married woman shall have power to bequeath, devise, or convey her separate property in the same manner and to the same extent as if she were unmarried; * * * and all deeds, mortgages, and legal instruments of whatever kind shall be executed by her in the same manner and have the same legal force and effect as if she were unmarried. A married woman shall have the right to purchase any species of property in her own name and to take proper legal conveyance therefor, and to contract and be contracted with in the same manner as if she were unmarried," &c.

In giving interpretation to this act in the case of *Pelzer, Rodgers & Co.* v. *Campbell & Co.*, 15 *S. C.*, 591, this court, in adverting to the fact, that the terms of the act are more full than those of the constitution, said: "It is plain that these apparent additions were nothing more than stating fully and particularly what was properly inferable from the powers given in the constitution to devise, bequeath, or alienate. So as to the third section: Can it be fairly, and with entire confidence, affirmed that the powers expressly given in the constitution to acquire property by gift, grant, inheritance, devise, or otherwise, do not include and authorize the subordinate powers specified by the act to purchase property in her own name, and take proper legal conveyances therefor, and to contract and be contracted with ? It is asked, with some force, how could she purchase or convey without the power to contract ? It is insisted that the particulars of the act are nothing more than the filling up of the general outline indicated by the constitution, &c."—page 592. See, also, the case of *Witsell* v. *Charleston*, 7 *S. C.*, 88.

The constitution gives to a married woman the express power to "alienate" her separate estate. What does that mean? The word "alienate" does not express any particular form of transfer,

but is a general term and embraces all the forms of transfer known to the law, on the principle that the whole includes all its parts. "To alienate is to pass property from one person to another." 1 *L. & R. Law Dict.*, under title "alienate." Does it not include a sale for consideration, or a gift without consideration, or a deed of conveyance absolute or conditional, for life or for years ? And if so, why not a mortgage as stated in the explanatory act ? Suppose there was here no statutory or constitutional "separate estate," but one created under the old equity doctrine by a deed of settlement *inter partes*, and the identical words of the constitution, "bequeath, devise, or alienate," were used in raising the powers, would not the broad and general term "alienate" give the *cestui que trust* in equity the right to charge the estate with a mortgage ? Can there be a doubt upon the subject ?

As Mr. Bishop says : "Out of the power which a *femme covert* has to dispose of her separate estate, or of the income thereof, whether the power proceeds from express words in the deed of settlement, or from the construction of the court, where the settlement is silent respecting it, grows the lesser power, which is included in the other, to *charge* the estate with a specific debt or engagement. This general doctrine is universal in our American courts, that this lesser power exists wherever the greater does," &c. 1 *Bishop Mar. Wom.*, sec. 870, and cases in notes. Again, at section 872, the same author says : "It is but reiterating in another form of words what has already been laid down, to say that if a married woman has the authority to convey her separate estate, she can therefore pledge or charge it with a debt or engagement whenever she employs express terms, or those which necessarily carry with them this intent. What will constitute a charge upon the estate 'is' in the language of Harris, J., in a New York case, 'simply a rule of evidence.' All agree that when a wife has expressly charged the payment of a debt upon her separate estate, whether it be her own debt or the debt of another, such *charge* is valid and will be enforced." *Yale* v. *Dederer*, 18 *N. Y.*, 265, and notes.

It is true, Mr. Bishop is not of our own State, but he is certainly a respectable authority, and after a very careful perusal of his work, I think I can venture to affirm that the above quota-

tions contain that which is undoubtedly good equity in England, and I think also of every other State of the Union, and I should be sorry indeed to see South Carolina alone repudiate a doctrine which is so sensible, just, and equitable and so well established everywhere else.

But it is said it has been decided in this State that a mortgage is not an alienation. *Warren* v. *Raymond*, 17 *S. C.*, 173, and *Simons* v. *Bryce*, 10 *Id.*, 354. True enough, it has been often held, and properly held, that until the mortgagor is out of possession a mortgage is not a complete alienation in the sense of the statute of W. and M., so as to place the property conveyed or "aliened" beyond the reach of creditors of the ancestor. But, surely, it cannot be necessary to show that that case has not the remotest analogy to this, nor anything whatever to do with a question as to what is embraced within the broad and general term "alienate" when used in the powers granted to a married woman. I suppose that the power to "alienate" would cover and embrace the lease of the premises for a month or a year, but it would not be assuredly on the ground that the lease was a perfect alienation ; but because, in reference to a power, the greater includes the lesser. It is impossible to entertain the idea for a moment that the power to "alienate" gives the right to exercise no control of the property, short of a complete and absolute alienation.

It is as certain as anything can be that down to 1880, when the case of *Pelzer, Rodgers & Co.* was decided, the law in this State was perfectly well settled, both by the legislature and the courts, that a married woman had the right not only to charge her separate estate by a mortgage executed for that purpose, but to bind herself by general personal engagements, without any reference to her separate estate. See *Wolfe* and *Witte*, and other cases cited by the Chief Justice. But in 1882, on the passage of the general statutes through the legislature, the act of 1870, above quoted, was amended by inserting in the fourth line of the third section, after the words "contracted with," the simple phrase "as to her separate estate ;" so that the section now reads :. "A married woman shall have the right to purchase any species of property in her own name, and to take proper legal conveyances therefor, and to contract and be contracted with as to her

separate property in the same manner as if she were unmarried."
See sec. 2,037, General Statutes.   And it is now contended that
these five words inserted in the act changed fundamentally the
powers of a married woman, and that she cannot now charge her
separate estate by giving a mortgage of it for the debt of
another.

As it seems to me, this is a grave error, arising for the most
part out of the mistaken view that the powers of a married wo-
man did not *originate in the constitution*, but were created by
the express power to contract given *in the act of the legislature*,
which was amended as before stated, this view, as it seems to me,
causing much more importance to be attached to the short amend-
ment that it is entitled to.   I suppose it is my fault, but I con-
fess that I am unable to understand the process by which the
conclusion about to be announced is reached :

*First.* The little amendment does not purport to repeal any-
thing ; all that it claims to do is to amend the act of 1870, so as
to limit the power to contract, therein given in general terms, to
the separate estate of the married woman.   Even that purpose
was not in terms declared, but this court has held in the recent
case of *Habenicht* v. *Rawls*, that limiting the power of contract
to the separate estate, was a negation of the power *except as to
such estate ;* that is to say, it repealed by implication the power
given by that act (not by the constitution) to make such general
personal contracts as might be sued at law.   It must not be over-
looked that there is a great difference between such general power
in a married woman and her contracts with express reference to
and charged upon her separate estate.

*Second.* But I deny most positively that the little amendment,
potential as it is claimed to be, had any effect whatever upon the
powers which were given *by the constitution* and involved in the
great power to "alienate" generally, as we have hereinbefore en-
deavored to show.  The amendment of the act of 1870 was nothing
more than an act of the legislature, and did not, and, of course,
could not, repeal any right given by the constitution.  If it had at-
tempted to do so, the effort would have been futile and vain, and
if it had in terms repealed the whole of the act of 1870, includ-
ing the declaration in it that a married woman could charge her

separate estate with a mortgage, most surely that would not have affected the constitution itself. All the rights and powers given by the constitution are as intact to-day as if the little amendment had never been made.

*Third.* I have not the least idea, however, that the legislature, in making the amendment, ever dreamed of the very large effect now about to be given to it. The act, after the amendment was incorporated, reads as follows : "A married woman shall have power to bequeath, devise, or convey her separate property in the same manner and to the same extent as if she were unmarried, * * * and all deeds, mortgages, and legal instruments, of whatever kind, shall be executed by her in the same manner, and have the same legal force and effect as if she were unmarried. * * * A married woman shall have the right to purchase any species of property in her own name, and to take proper legal conveyances therefor, and to contract and be contracted with as to her separate estate in the same manner as if she were unmarried," &c.

Would it not be most extraordinary if the words in the third section, "as to her separate estate," should be held to destroy most of the other provisions in the same act ? It is one of the rules of construction that we must assume that every part of the act was intended to have some meaning. It is a judicious habit of courts to seek for some construction by which every part of the statute may be given its proper effect. In my judgment such construction is at hand here. A construction which harmonizes all parts of the act is not inconsistent with the constitution— is in exact accordance with the words used, and, as I believe, also with the intention of the lawmakers. The words "as to her separate estate" were manifestly inserted for the purpose of making *an exception* to a proposed limitation upon the power to contract, and therefore they do not intimate any change of the law to the extent of the exception ; that is to say, *as to her separate estate ;* as to that the law stands entirely untouched by the amendment. Then is it not obviously the proper construction that the framers of the amendment intended to leave entirely unaffected the powers of a married woman as to her separate estate ; but to take from her the power to make personal and general contracts, without any reference to her separate estate, such as notes,

bonds, endorsements, guarantees, &c., which latter power being given by the act of 1870, was repealable ?

Keeping in view that the object was to repeal so much of the act of 1870 as gave the power to contract generally, and not to limit (which the legislature could not) any power to contract arising out of the *constitution*, the words used were appropriate, and are intelligible. What is the ordinary and proper meaning of the prepositional phrase, "as to" ? Is there any one living who, upon being asked the question, would not on the instant answer that it means "with respect to," "in reference to," "concerning," "about" ? Accordingly we find that the dictionaries (Webster and Worcester) declare the definition to be "with respect to." That being the case, what warrant is there for making the phrase "as to" mean "in consideration of," or "for the benefit of" ? If such be the proper construction, the provision is clearly unconstitutional, as undertaking to meddle with a matter already fixed by that instrument.

But it is manifest, as it seems to me, that such is not the proper meaning of the phrase. To describe the property specifically and declare the purpose answers fully the definition "with respect to." If a married woman should convey her estate for any purpose whatever, would that not be "in respect" to it ? If she should give it away, would that not be "with reference" to it ? And if she should charge it, describing it clearly, by mortgage or otherwise, who can say that that would not be "in reference to" that part of her separate estate ? I confess I cannot see the necessity of straining a meaning into the phrase which the words do not require, and especially as such construction makes an act of the legislature in effect repeal a provision of the constitution. On the other hand, the natural construction is not inconsistent with the provisions of the constitution, gives effect to all the different parts of the act, and makes the law as a whole consistent and symmetrical—taking from a married woman the right to contract *in the air*, that is, to make general personal engagements given to her by the act of 1870; but leaving her, as the constitution endowed her, with the power "to alienate," that is to say, to sell, convey, give, lease, mortgage, or charge in any other way her separate estate at her own will and pleasure "as if she were

unmarried." The constitution, in my judgment, gave her these rights, and no mere act of the legislature can take them away from her. The constitution added largely to her power of taking and holding property in her own right, and I have never been able to see why it should be regarded so dangerous, when at the same time, it increases her control over the very thing given. But wise or unwise, politic or impolitic, the constitution gave her these rights, and I know of no authority, short of a constitutional provision, that can take them away from her.

With an earnestness, increased, perhaps, by witnessing the struggle to get back to the old chaos and confusion, "in respect to" the rights of married women, I repeat the closing remark of the opinion in the case of *Pelzer, Rodgers & Co.* v. *Campbell & Co.*: "In the language of Chancellor Wardlaw, we hope it may never be considered improper for the wife to contribute, by all lawful means, to the success of her husband's enterprises. In many cases it is both politic and dutiful that such power should be exercised."

I am clearly of opinion that the ruling of Judge Hudson was right and should be affirmed.

Judgment reversed.

In this case a petition for rehearing was filed by the plaintiffs. Upon this petition the court endorsed an order bearing date January 6, 1888, in the words following: "We have carefully considered this petition and finding that no material fact or important principle of law has been overlooked, the petition is dismissed by order of the court."